UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------X
LEONEL MEJIA,

                    Petitioner,                    <u>MEMORANDUM AND ORDER</u>

   -against-                            CV 10-736 (LDW)

UNITED STATES OF AMERICA,

                    Respondent.
----------------------------------------------------X
WEXLER, District Judge

       Petitioner Leonel Mejia ("Mejia") moves under 28 U.S.C. § 2255 to vacate his judgment
of conviction and sentence of imprisonment imposed by this Court. The government opposes the
motion.

## I. BACKGROUND

       For purposes of this decision, the relevant background can be summarized as follows:

A. <u>The Murder, Mejia's Statements, and Seizure of the Murder Weapon</u>

       1. <u>The Sanchez Murder</u>

       Mejia, an alleged member of the La Mara Salvatrucha, "MS-13," street gang, was charged
with the murder of fellow MS-13 member Edgardo Sanchez ("Sanchez") on the night of
September 13, 2003 in a wooded area in Farmingdale, New York. Trial Transcript ("Tr.") 604-
09, 725-26, 905, 1087-93. Mejia killed Sanchez by firing one bullet through his heart at close
range, admittedly because he believed, correctly, that Sanchez had provided information to local
law enforcement officers that led to the arrests of several MS-13 members on murder and assault
charges. Tr. 605, 802-13.

2.  <u>Mejia's Oral and Written Statements to New York State Police Investigators</u>

On September 16, 2003, New York State Police Investigator Robert Rodriguez ("Investigator Rodriguez") interviewed Mejia three times in the New York State police barracks in Bethpage, New York.  Tr. 597-609.  Following repeated oral and written rights waivers, Mejia provided Investigator Rodriguez and other investigators with several oral statements and a typewritten statement on September 16 and 17, 2003.  Mejia acknowledged, *inter alia*, that he was an MS-13 member, that he was with Sanchez and other MS-13 members at a delicatessen in Hempstead, New York on the night of September 13, 2003, that he possessed a handgun that night, and that MS-13 members discussed a plan to murder Sanchez because they believed he was an informant.   Tr. 614-23.  While Mejia initially denied being present at the murder, he later admitted being present.  Nevertheless, he initially claimed that fellow MS-13 member Mario Zuniga ("Zuniga") shot and killed Sanchez.  Tr. 620.

Before the first two interviews, Investigator Rodriguez advised Mejia of his rights in both Spanish and English, and Mejia orally waived his right to counsel and his right to remain silent. Tr. 597-609, 614-23.  During breaks and between the three interviews, Mejia ate, slept, and used the restroom.  Tr. 235-58, 617-18.  He was told that he could use a telephone.  Tr. 642-44.

Following the third interview, at approximately 7:05 a.m. on September 17, 2003, Investigator Rodriguez went to observe an interview of Zuniga being conducted in another room. Tr. 239, 620.  While there, he was informed that Mejia wanted to speak to him again.  Tr. 239. Consequently, Investigator Rodriguez returned to the lunchroom to speak to Mejia, who indicated that he could provide information about stabbings.  Tr. 240.

During this conversation, at approximately 8:31 a.m., Investigator Thomas Hughes, the

investigator responsible for interviewing Zuniga, called Investigator Rodriguez out of the lunchroom and informed him that Zuniga had just identified Mejia as the shooter. Tr. 240-41. Investigator Rodriguez then returned to the lunchroom and confronted Mejia with Zuniga's allegation. Tr. 241. At that point, Mejia admitted shooting and killing Sanchez. Tr. 241, 604-09, 622-23. Rodriguez then had Mejia explain the entire incident again. Tr. 242, 622. During that explanation, Mejia revealed that the murder weapon was hidden in his residence. Tr. 245.

After Mejia described the events leading up to the murder and the murder itself, and following another rights waiver, Rodriguez took a typewritten statement from Mejia. Tr. 242-44, 622-23. In that statement, Mejia explained how he shot and killed Sanchez and hid the murder weapon in his residence.

Later, while being transported by New York State Police personnel, Mejia overheard an officer comment to another officer that he had once arrested Sanchez. After hearing the remark, Mejia said, "You arrested him, I killed him, I killed the fuck." Tr. 905.

3. Seizure of the Murder Weapon

After providing the written statement, Mejia signed a consent-to-search form relating to his residence. Tr. 623. Law enforcement personnel escorted Mejia to his residence, where Mejia opened the door and pointed to the bureau by his bed as the location of the murder weapon. Tr. 623-28. The investigators then seized the handgun used to murder Sanchez. Tr. 847-49.[1]

4. Mejia's Videotaped Statement to the Nassau County District Attorney's Office

After departing the residence, Mejia was transported to the Nassau County District Attorney's Office, where he provided a videotaped statement to an assistant district attorney on

---

[1] The handgun was later admitted at trial and ballistics evidence tied it to the murder.

the afternoon of September 17, 2003.  Tr. 247-49, 628.[2]  Prior to any interrogation, Mejia was again advised of and again waived his rights.  Tr. 248.

Thereafter, Mejia provided information about MS-13 and described in detail how he shot and killed Sanchez on the night of September 13, 2003, including that:

(1)  MS-13 is "a Salvadorian, Central American gang";

(2)  MS-13 members "wear blue bandanas";

(3)  He had been an MS-13 member for 2-3 years;

(4)  MS-13 is involved in "fighting with other gang members," including the "SWP" and Latin Kings;

(5)  He was initiated into MS-13 by being "jumped by three [MS-13 members]";

(6)  MS-13 is divided into "cliques"; he identified his clique as "HLS -- Hempstead Locotes Salvatruchas";

(7)  He has an MS-13 tattoo signifying his membership, three dots in the web of his hand, which he described as representing "death, hospital, jail . . . the main three reasons to be in the gang . . . the three points of your life";

(8)  He held the position of "soldier" in the MS-13 leadership hierarchy, which he described in detail;

(9)  MS-13 meetings are held regularly and that dues, usually $13.00, are collected at each meeting;

(10)  MS-13 "collect[s] money to buy, buy stuff, like they collect money to buy guns, they collect money to buy cars or drugs";

_____

[2]The videotaped statement was admitted into evidence at trial.

(11)  MS-13 members must make their "quota" as part of their membership in the gang;

(12)  When Sanchez arrived for an MS-13 meeting at a delicatessen on the night of September 13, 2003, Mejia and other MS-13 members decided to cancel the meeting because "we heard that [Sanchez] was a snitch";

(13)  An MS-13 member from the Freeport clique incarcerated for murder had sent a letter from the Nassau County jail informing other MS-13 members that Sanchez was "a snitch";

(14)  Sanchez had "already signed a statement about what [the incarcerated MS-13 member] did";

(15)  After deciding to cancel the meeting, Mejia and other MS-13 members present discussed killing Sanchez;

(16)  He brought a loaded 9 millimeter MS-13 handgun to the delicatessen;

(17)  He agreed to kill Sanchez to make his "quota";

(18)  Another MS-13 member present told Sanchez that they were going to a party in Farmingdale as a ruse to lure him to a location where he could be killed;

(19)  Once they arrived at the Farmingdale location, they walked into a wooded area;

(20)  In the wooded area, "I just turned around and I shot him," gesturing to his chest;

(21)  He attempted to shoot Sanchez a second time "in the head" but the handgun jammed;

(22)  After the murder, "we went to my house, I dropped the gun there"; "I hide it behind my bed"; and "I cooperate with the police and told them where it was";

(23)  He killed Sanchez "because he was a snitch" who had provided information against a member of the Freeport MS-13 clique; and

(24)  Sanchez had to be killed "because he was probably going to keep doing the same thing -- ratting on probably, mostly, everybody."

During the videotaped statement, Mejia was calm and conversational.  In it, Mejia acknowledged that the police read him his rights before they questioned him and, when asked how the police treated him, he responded:  "It was nice, it was fine"; "I didn't give them no problem and they didn't give me no problem"; and they "gave me soda and lunch and dinner."

B.  Pretrial and Trial Proceedings

1.  Mejia's Suppression Motion

On April 4, 2006, Mejia moved to suppress his oral, written, and videotaped statements, as well as the seized handgun.  In his motion and his supporting affidavit, Mejia contended that: (1) he did not recall whether he was advised of his constitutional rights prior to giving his statements; (2) the investigators had falsely promised him a prison sentence of "no more than eight or ten years" if he cooperated; (3) an investigator had assaulted him during the interrogations; (4) the investigators threatened to strike him again if he did not cooperate; (5) he signed his typewritten statement "without reading it or having it read to him"; and (6) he did not consent to the search of his residence.  Tr. 294.  Regarding the alleged assault, Mejia asserted that

> [w]hen I tried to explain that I did not know what they wanted to know, or what they wanted me to say, one of the investigators struck me in the face with his hand and threatened that I would be struck again if I refused to answer questions about MS-13 and its activities.  I was also told by one of the investigators that if I did not cooperate with them, I would spend the rest of my life in prison.  The investigators repeated this routine with me throughout the day of my arrest. . . .  The actions and statements of the investigators made me extremely frightened for my safety and

> well-being and eventually made me believe that I had no choice but
> to answer their questions.

Affidavit of Defendant Leonel Mejia, dated April 4, 2006, ¶¶ 6-7.

The Court conducted a suppression hearing on April 11, 2006, during which Investigator Rodriguez and another investigator testified. Tr. 231-90. During the hearing, Mejia's counsel supplemented Mejia's written motion by contending that Mejia's statements should be suppressed because his will had been overborne as a result of the length, nature, and timing of the interrogations. Tr. 288-97.

On April 12, 2006, this Court denied the suppression motion, finding that Mejia's contentions were unsupported; that the government had established that Mejia knowingly, intelligently, and voluntarily waived his rights in providing the oral, written, and videotaped statements; and that Mejia had voluntarily consented to the search of his residence. Specifically, the Court found that Mejia "was advised or readvised of his rights prior to giving any statements and that the statements were not taken under circumstances indicating the defendant's will was overcome by the conditions under which he was held. . . . [T]he evidence sufficiently establishes the defendant voluntarily waived his rights." Tr. 295-96.

2. The Government's Expert Testimony Notice

Prior to trial, the government maintains that it notified the defense that it intended to call New York State Police Investigator Hector Alicea ("Alicea") as an expert witness to testify about, "the structure, operations, and history of the MS-13 street gang. He will further testify about the hierarchy, cliques, methods, criminal activities, modes of communication, symbols and slang terminology used by MS-13 members." Government's Response in Opposition to

Petitioner's Motion ("Government's Mem.), at 11 (quoting Government's April 7, 2006 Expert Notice).

### 3. Trial Evidence and Arguments

At trial, the government's evidence consisted of, *inter alia*, (1) the testimony of ten civilian or law enforcement witnesses; (2) Mejia's oral, written, and videotaped statements; the murder weapon found in Mejia's bedroom; (3) photographs of the crime scene, Mejia's gang tattoo, and the "XIII" he had shaved into his eyebrows prior to his arrest; (4) the testimony of four former MS-13 members (two of whom were present when Mejia murdered Sanchez); (5) a seven-minute videotaped recording of MS-13 members attending the funeral of a member[3]; (6) and the testimony of Alicea, who provided background expert testimony relating to MS-13, as described in the government's pretrial notice.

### a. Testimony of MS-13 Member Ralph Admettre

MS-13 member Ralph Admettre ("Admettre") testified, *inter alia*, that:

(1) He had been a member of the MS-13 since the age of 16 and had been in three different cliques over six years;

(2) MS-13 was an El Salvadorian street gang;

(3) MS-13 members identify themselves as members with tattoos, blue bandanas and other gang paraphernalia, and a specific handsign;

---

[3] That videotape recording, which was made by MS-13 members themselves, depicted a large number of MS-13 members from several different cliques attending a wake on Long Island for a deceased member. In the recording, members could be seen, *inter alia*, (1) wearing bandanas and beads bearing the gang's colors and demonstrating the gang's handsign; (2) placing blue bandanas and beads in the coffin with the deceased and gathering around the coffin by clique holding the gang handsign above their heads; and (3) spelling out their cliques' names and initials using certain MS-13 handsigns.

(4)  A common MS-13 tattoo was three dots in the web of the hand - with the three dots representing jail, hospital, and cemetery – the three destinations of an MS-13 member;

(5)  The MS-13 street gang was divided into different cliques, all of which were part of the same organization;

(6)  MS-13 cliques operated in New York, California, Texas, North Carolina, Virginia, and Florida;

(7)  MS-13 cliques regularly held meetings at which dues were collected to fund a clique treasury;

(8)  MS-13 treasury money was used "to bail people out [of jail], buy guns, buy bats, knives, bullets";

(9)  Inter-clique meetings, called "Universals," were held to coordinate criminal activities between different cliques;

(10)  Prior to September 2003 (the month of the Sanchez murder), he had attended MS-13 Universal meetings in New York where MS-13 members from California were in attendance;

(11)  Members are initiated by being "jumped into" the gang in a beating ritual;

(12)  Members are initially on "probation" and must make their "quota" to advance from probationary status;

(13)  MS-13 members make their "quota" by carrying out an act of violence against a member of a rival gang;

(14)  MS-13 engages in violent rivalries with other street gangs, including the SWP, Latin Kings, Crips, and 18th Street;

(15)  Between MS-13 and the rival gangs, there was "[p]retty much a war, where anytime

you see each other, anything is capable of happening -- shot, killed, stabbed, fight";

(16) He and other MS-13 members routinely carried out drive-by shootings, referred to as "jales," against rival gang members;

(17) MS-13 cliques would carry out "jales" in the territory of other MS-13 cliques on behalf of those MS-13 cliques, in an effort to minimize the identification of the perpetrators;

(18) Under the rules of the gang, any MS-13 member who cooperates with law enforcement authorities should be killed by the gang;

(19) Prior to September 2003 (the month of the Sanchez murder), MS-13 members on Long Island had murdered members of rival gangs pursuant to MS-13's street wars;

(20) In January or February of 2003 (months prior to the Sanchez murder), he earned his "quota" by shooting a member of a rival gang;

(21) On June 18, 2003, he and fellow MS-13 members from the HLS and Freeport cliques shot three young men believed to be members of rival gangs during two separate shootings;

(22) Following the June 18, 2003 shootings, he told Sanchez about the shootings;

(23) He stole approximately 10 automobiles for MS-13 to use in drive-by shootings between January and June of 2003;

(24) Prior to the Sanchez murder, MS-13 on Long Island sold cocaine and marijuana in bars and local clubs in territory that the gang controlled;

(25) MS-13 on Long Island taxed drug dealers who wanted to sell narcotics in territory that the gang controlled; and

(26) While they were both incarcerated in the Metropolitan Detention Center, Mejia

called him a "rat" and attacked him with a homemade knife.  Tr. 491-592.

      b.  <u>Testimony of MS-13 Member William Reyes</u>

MS-13 member William Reyes ("Reyes") testified, *inter alia*, that:

(1)  For several years prior to his arrest in 2002, he had been a member of the MS-13 HLS clique;

(2)  MS-13 members are initiated with a 13-second beating;

(3)  MS-13 members signify their membership with various tattoos, including three dots on the web of the hand -- representing "jail, death, hospital," and by wearing the color blue;

(4)  The HLS clique regularly held meetings, at which dues were collected;

(5)  The SWP, Bloods, and Latin Kings were street gangs who were "our rival enemies";

(6)  MS-13 members must make their "quota" before becoming a full member;

(7)  MS-13 members make their "quota" by "doing drive-by shootings, killing another member from another gang . . . doing a drive-by shooting, basically by shooting somebody or killing them";

(8)  He earned his "quota" by participating in a shooting against rival gang members;

(9)  On behalf of MS-13, he engaged in a series of shootings, stabbings, beatings, and other assaults against members of rival gangs for several years up to the time of his arrest;

(10)  MS-13 members had murdered members of rival gangs pursuant to MS-13's violent rivalries with other gangs;

(11)  MS-13's rule regarding police informants was to "Kill them";

(12)  In MS-13, the penalty for being an informant was "death";

(13)  He and other MS-13 members sold cocaine in bars and other locations controlled by

the MS-13, with a portion of the proceeds going into the clique's treasury; and

(14)  Clique treasury money was used "for weapons, guns, to bail people out [of jail], put money on whoever is locked up, put money in their commissary."  Tr. 945-92.

        c.  <u>Testimony of MS-13 Member Mario Zuniga</u>

MS-13 member Zuniga testified, *inter alia*, that:

(1)  Prior to his arrest in September 2003, he had been a member of the MS-13 HLS clique for several years;

(2)  Being in MS-13 meant "beating people up, stabbing people, extortion, anything possible, murder . . . murder is one of the main things";

(3)  MS-13 is a street gang that started in California and has cliques "all over the United States";

(4)  MS-13 members are initiated with a 13-second beating;

(5)  MS-13 members identify themselves "by colors, by tattoos," and he has a three-dot tattoo, with the dots standing for "hospital, death, jail";

(6)  MS-13 members used a specific handsign to identify themselves;

(7)  MS-13 cliques regularly held meetings, at which dues were collected;

(8)  MS-13 members used the clique treasury "to buy either drugs sometimes, either pay money, guns";

(9)  MS-13 members would "buy drugs through suppliers to sell them to benefit us";

(10)  He had sold cocaine and marijuana (Tr. 696);

(11)  In MS-13, the penalty for assisting law enforcement authorities was "Murder, [you] get killed if you cooperate";

(12)  MS-13 members must make their "quota" before getting "full respect";

(13)  MS-13 members earn their quota "by stabbing, killing people";

(14)  MS-13 had violent rivalries with rival street gangs, including "Bloods, Kings, Netas, SWPs, 18th Street";

(15)  He was aware of instances where MS-13 members on Long Island had murdered members of rival gangs prior to his arrest in September 2003;

(16)  Prior to the Sanchez murder, he had attempted to stab a member of the Latin Kings and shoot a member of the Bloods using an MS-13 handgun;

(17)  He intended to kill the Bloods member when he shot at him;

(18)  On the night of September 13, 2003, prior to the murder, he discussed killing Sanchez with Mejia and other MS-13 members;

(19)  After those conversations, he helped lure Sanchez to a location so Mejia could murder him;

(20)  He was present in a wooded area when Mejia shot Sanchez in the chest at close range, killing him; and

(21)  Mejia tried to shoot Sanchez a second time but the handgun jammed.  Tr. 686-795.

d.  Testimony of MS-13 Associate Jose Ramos

MS-13 associate Jose Ramos ("Ramos") testified, *inter alia*, that:

(1)  In September 2003, prior to the Sanchez murder, he had been an associate of the MS-13 HLS clique;

(2)  On the night of September 13, 2003, prior to the murder, he saw Zuniga and Mejia talking and, immediately thereafter, Zuniga told him that they wanted to kill Sanchez;

(3) Later that night, he saw Mejia, Zuniga, and Sanchez walk into a wooded area and then heard a single gunshot;

(4) Mejia emerged from the wooded area holding a handgun;

(5) Mejia said that he had just shot Sanchez in the chest;

(6) Mejia said that, if the handgun had not jammed, he would have kept shooting; and

(7) He was afraid that, if he refused to accompany Mejia and Zuniga during the murder, he could have been killed himself. Tr. 993-1043.

### e. The Testimony of Investigator Hector Alicea

Alicea testified generally about the structure, history, and operations of the MS-13 street gang. Among other things, he testified that MS-13 is a street gang that is divided into different chapters, or "cliques," which are frequently organized in specific towns; that the different cliques operate as part of a larger organization; that members wear blue items, including bandanas and beads, to signify membership; and that members also signify membership and communicate with certain handsigns. Tr. 378-96.

On cross-examination, Alicea also testified, *inter alia*, that:

(1) A primary reason why a young person might join MS-13 is because

> when these individuals come to this country, a lot of them are living in single-parent homes, the Mom has to work two jobs or the Dad has to work two jobs, the kids go to school, there are gang members in school from different gangs and when they are done with school, they have nowhere to go. They don't go home because the parents aren't there so they are surrounded [in] this environment and they are asked to join one gang or another and some of them are weak minded as I would say and they opt to join. One of the other reasons is they get chased by other gang members even though they are not a gang member so they feel they want to join a gang so I don't get chased around, I don't get beat up every

> day . . . MS-13 is no different than the other gangs. What they give
> these kids [is] a sense of belonging, a sense of brotherhood, a sense
> of family [that] perhaps they are not getting at their homes. I
> would say it's more a sense of belonging to something. Tr. at 442-
> 43;

(2) There are rules requiring MS-13 members to help one another, and that members can suffer sanctions, including violence, for failing to following the rules;

(3) MS-13 members sometimes lie to protect other MS-13 members and have even accepted responsibility for the criminal acts of other MS-13 members;

(4) It was common within MS-13 to pass firearms amongst members; and

(5) Mejia "was never a shot-caller," meaning he never held a leadership position in the MS-13. Tr. 467.

### 4. Conviction and Sentence

On April 19, 2006, Mejia was convicted on counts of Conspiracy to Commit Murder in Aid of Racketeering (Count One) in violation of 18 U.S.C. § 1959(a)(5); Murder in Aid of Racketeering (Count Two) in violation of 18 U.S.C. § 1959(a)(1); Discharge of a Firearm During a Crime of Violence (Count Three) in violation of 18 U.S.C. § 924(c)(1)(A)(iii); and Causing the Death of a Person Through the Use of a Firearm (Count Four) in violation of 18 U.S.C. § 924(j)(1). Mejia was sentenced to life imprisonment on Counts Two and Four, and ten years' imprisonment on Counts One and Three.

## C. Appeal

Following his conviction, Mejia appealed to the Second Circuit. On May 28, 2008, the Second Circuit affirmed Mejia's conviction and sentence by summary order. *See United States v. Mejia*, 280 Fed. Appx. 32, 2008 WL 2228671 (2d Cir. 2008). On June 24, 2008, the Second

Circuit issued the mandate.  Because no petition for certiorari was filed with the Supreme Court, Mejia's conviction became final 90 days later, on September 22, 2008.  Pursuant to § 2255(f), Mejia then had one year to file a motion under § 2255.  *See* 28 U.S.C. § 2255(f) ("A 1-year period of limitation shall apply to a motion under this section.").

D.  Mejia's Motions

    1.  Filing of the § 2255 Motion

According to the docket, on February 17, 2010, Mejia filed with this Court a § 2255 motion, dated January 10, 2010 and captioned as an "AMENDED" motion (the "Amended Motion").  Attached as Exhibit A to the Amended Motion is a purported "original motion," dated May 23, 2009 (the "Original Motion").  In his Original and Amended Motions, Mejia raises various claims based on ineffective assistance of counsel.

In its opposition papers, the government asserts that it did not receive the Original Motion until it was included as an attachment to the Amended Motion.  Similarly, the Court has no record of receiving the Original Motion until it was included as an attachment to the Amended Motion.

In his reply papers, Mejia asserts that the Original Motion was "mailed" to the Court on May 23, 2009, when he gave the motion to a "range officer" at the correctional facility where he was imprisoned.  Petitioner's Traverse Motion at 2-3.  He speculates that "said correctional officer or another officer very well may have trashed his motion and never mailed it to the court or that the court clerk never filed the motion and never put it on the docket sheet."  *Id.* at 3.  He further posits that "[m]aybe that day one of the officers was mad at Mejia or maybe the officer Mejia had assaulted came in contact with the envelope [sic]  Who knows."  *Id.* at 4.

2. <u>Motions for Extension of Time and Appointment of Counsel</u>

Prior to filing the Amended Motion, Mejia filed a motion for appointment of counsel, dated April 30, 2009, in which he stated that he was "in the process of filing a 2255 motion for ineffective assistance of counsel" (the "April 30, 2009 Motion"). The April 30, 2009 Motion was filed in this Court on May 9, 2009 (as docket number 387 in the underlying criminal action, CR 03-851), after it was misdirected to the Second Circuit. In directing that motion to this Court, the Clerk of Court for the Second Circuit referred to the motion as a request "for an extension of [Mejia's] deadline to file his 2255 motion" and for appointment of counsel – although the request does not expressly seek an extension of time. This Court took no action on the April 30, 2009 Motion.

Mejia again requested appointment of counsel by motion dated May 20, 2010, and filed May 24, 2010. This Court denied that request without prejudice to renewal following the government's response to the § 2255 motion.

3. <u>Mejia's Claims</u>

In his substantive § 2255 motions, Mejia contends that the two counsel who represented him at trial and on appeal, Elizabth E. Macedonio ("Macedonio") and Randall D. Unger ("Unger"), were ineffective in that they failed to: (1) inform him that the government had extended a plea offer prior to trial[4]; (2) inform him of the opportunity to seek Supreme Court review of the Second Circuit decision upholding his conviction and sentence; (3) move to exclude, and challenge on appeal, the expert testimony of Alicea; (4) move to dismiss Count

_____

[4]At some points Mejia claims that the purported plea offer was for 40 years, *see* Original Motion Mem. of Law at 12, while at other times he claims that it was for 45 years, *see id.* at 16.

Three as a lesser-included offense of Count Four, as a violation of the Double Jeopardy Clause; (5) contend that his confession to New York State police investigators was the product of "torture"; (6) adequately investigate his case and cross-examine certain government witnesses; (7) argue that the government failed to prove that MS-13 had an effect on interstate commerce and that he committed the murder in order to maintain or increase his position in MS-13; and (8) move to remove a juror whose husband attended the trial and took notes.

In opposition, the government concedes that Count Three is a lesser-included offense of Count Four and, thus, it does not object to the dismissal of Count Three and the issuance of an Amended Judgment and Commitment Order reflecting such dismissal. However, the government argues that the motion is barred by the one-year limitations period and, in any event, should be denied because Mejia fails to establish that his defense attorneys provided ineffective assistance, and because he fails to demonstrate a reasonable probability that the outcome would have been different absent the purported errors. In opposing the motion, the government includes a declaration of Macedonio, who directly contradicts several of Mejia's contentions and explains her tactical decisions. *See* Declaration of Elizabeth E. Macedonio, Ex. 2 to Government's Mem. ("Macedonio Decl."). The government urges the Court not to issue a certificate of appealability.

## II. DISCUSSION

### A. Timeliness and Equitable Tolling

In opposing Mejia's § 2255 motion, the government challenges the substantive claims, but also asserts that the motion is barred by the one-year limitations period. The government argues that Mejia fails to offer any reliable indication that he filed either of his motions before

the one-year limitations period expired.  This Court agrees.  As the government points out, Mejia

filed another motion in this matter, dated April 10, 2010 (docket number 7), in which he asserts:

"On May 24, 2009, Movant also mailed to the Court a Request for equitable tolling (from April

20, 2008 to May 10, 2009 due to institutional total lockdown because of the riot at this

institution).  This motion is also not on the courts docket sheet."  As the government argues, had

Mejia given the Original Motion to prison officials for mailing on May 23, 2009, as he asserts,

there would have been no reason for him to move for equitable tolling at that time and in a

separate submission, since the Original Motion would have been timely mailed.  Moreover,

Mejia presents no evidence that he ever paid, or was charged, for those mailings by prison

authorities.  These circumstances belie Mejia's claim to have presented the Original Motion to

prison officials for mailing on May 23, 2009.  Rather, the circumstances indicate that Mejia

recognized that his § 2255 motion was not filed on time.

As for Mejia's April 30, 2009 Motion, when that motion was made, Mejia's time to move

under § 2255 had not expired.  However, even if the April 30, 2009 Motion is treated as a motion

for extension of time, this Court had no jurisdiction over that request at that time because Mejia

had not filed a substantive § 2255 motion.  *See Green v. United States*, 260 F.3d 78, 82-83 (2d

Cir. 2001) (observing that prior to actual filing of § 2255 motion, there is no case or controversy

and any opinion regarding timeliness would be merely advisory); *United States v. Leon*, 203 F.3d

162, 164 (2d Cir. 2000) (same).

As the Second Circuit has explained, "a district court may grant an extension of time to

file a motion pursuant to section 2255 only if (1) the moving party requests the extension upon or

after filing an actual section 2255 motion, and (2) 'rare and exceptional' circumstances warrant

equitably tolling the limitations period." *Green*, 260 F.3d at 82-83. Thus, given Mejia's filing of an actual § 2255 motion, this Court may grant the request for an extension now but only if "rare and exceptional" circumstances exist to warrant equitable tolling. To equitably toll the limitations period, Mejia must show "extraordinary circumstances prevented him from filing his petition on time," and that he "acted with reasonable diligence throughout the period he seeks to toll." *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000) (per curiam). In addition, Mejia must show a causal link between the extraordinary circumstances and the lateness of the filing. *See Valverde v. Stinson*, 224 F.3d 129, 134 (2d Cir. 2000).

Upon consideration, the Court finds that Mejia fails to show the existence of "rare and exceptional" circumstances to warrant equitable tolling of the limitations period and that he acted with reasonable diligence throughout the period. Mejia's purported lack of legal training and prison lockdown are not sufficient to show extraordinary circumstances. *See Pillco v. Bradt*, No. 10 Civ. 2393 (SAS), 2010 WL 3398467, at *2 (S.D.N.Y. Aug. 26, 2010) ("To meet the extraordinary circumstances standard, a petitioner must prove that the cause of his delay was both beyond his control and unavoidable even with diligence. For example, difficulty in gaining library access, prison lockdowns, [petitioner's] lack of legal training, poor eyesight, and transfers to various prisons fail to meet the requisite extraordinary circumstances.") (footnotes and internal quotation marks omitted). As noted above, Mejia's claim that he gave the Original Motion to prison officials for mailing on May 23, 2009 is belied by the circumstances, including his own claim that he mailed a motion for equitable tolling at about the same time. Moreover, although a claim by Mejia that prison officials intentionally confiscated or destroyed his motion papers would be "extraordinary" as a matter of law," *Valverde*, 224 F.3d at 133-34, the only support for

those assertions is Mejia's speculation. Given the apparent absence of "rare and exceptional" circumstances, the motion for an extension of time is denied.

Nevertheless, if Mejia's April 30, 2009 Motion could be treated as a § 2255 motion, such motion would have been timely. The Court could then grant him permission to amend that motion in accordance with the untimely-filed Amended Motion. However, the Court is unable to treat the April 30 Motion as a substantive § 2255 motion because it fails to reference any cognizable claim under § 2255, that is, it fails to articulated grounds for relief *and* supporting facts. *See Green*, 260 F.3d at 83-84.

Accordingly, Mejia's § 2255 motion must be dismissed as time-barred.

## B. Mejia's Claims

Even assuming that Mejia's motion was timely, the Court finds no merit to his ineffective assistance of counsel claims (except to the extent that Count Three should be dismissed, as the government concedes), as briefly discussed herein.

### 1. Standard for Determining Ineffective Assistance of Counsel

A claim of ineffective assistance of counsel can be sustained only if counsel's representation fell below an objective standard of reasonableness and there is a reasonable probability that absent counsel's errors the outcome of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *Jackson v. Leonardo*, 162 F.3d 81, 85 (2d Cir. 1998). Counsel's advice is not required to withstand a retrospective examination in a post-conviction hearing. *See McMann v. Richardson*, 397 U.S. 759, 770-71 (1970). Instead, what is required is that the defendant and counsel use their best judgment as to the weight of the prosecution's case. Provided counsel is prepared with relevant facts and

appropriate legal standards, strategic decisions regarding the challenging of evidence and witnesses cannot be second-guessed in an effort to support an ineffective assistance of counsel claim. *See United States v. DiPaolo*, 804 F.2d 225, 234 (2d Cir. 1986); *Gonzalez v. United States*, 337 F. Supp. 2d 419, 423 (E.D.N.Y. 2004). The "ultimate focus of inquiry" is "whether . . . the result of the particular proceeding is unreliable because of a breakdown in the adversarial process." *Strickland*, 466 U.S. at 696; *see, e.g., United States v. Reiter*, 897 F.2d 639, 645 (2d Cir. 1990) (affirming rejection of ineffective assistance of counsel claim even though defense counsel's failure to move to suppress evidence, poor cross-examination, and frequent lateness and absences fell below professionally reasonable standards, given overwhelming evidence of defendant's guilt). As the Supreme Court further explained in *Strickland*:

> [A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

*Strickland*, 466 U.S. at 697.

2. <u>Analysis of Claims</u>

a. <u>Failure to Advise of Plea Offer Prior to Trial</u>

As for counsels' purported failure to inform Mejia of a plea offer prior to trial, Macedonio states, *see* Macedonio Decl. ¶ 3, and the government acknowledges, that the government never offered to let Mejia plead guilty before trial to a sentence of 40 or 45 years. Mejia does not challenge Macedonio's and the government's assertions in his reply papers. Accordingly, this claim is denied.

### b. Failure to Advise of Opportunity for Supreme Court Review

As for counsels' purported failure to inform Mejia of the opportunity to seek Supreme Court review, Macedonio states that, after the Second Circuit affirmed Mejia's conviction, she "informed Mr. Mejia of his option to seek Supreme Court review." *See id.* ¶ 9. Mejia does not challenge Macedonio's assertion in his reply papers. Accordingly, this claim is denied.

### c. Failure to Challenge Confession to New York State Police Investigators

As for counsels' purported failure to challenge Mejia's confession to New York State police as the product of "torture," Mejia's contentions in support of this claim are belied by the record. On April 11, 2006, the day before the trial began, this Court held a suppression hearing, at which defense counsel argued that Mejia's statements should be suppressed because his will was broken as a result of the length, timing, and nature of the interrogations. *See* Tr. 288-90. This Court denied the suppression motion the next day prior to opening statements, finding that Mejia's contentions were unsupported; that the government had established that Mejia knowingly, intelligently, and voluntarily waived his rights in providing the oral, written, and videotaped statements; and that Mejia had voluntarily consented to the search of his residence. Thus, defense counsel made, and did not succeed on, the very motion that Mejia now claims should have been made. That the motion was unsuccessful provides no grounds to allege or find ineffective assistance. Accordingly, this claim is denied.

### d. Failure to Move to Remove Juror Whose Husband Attended Trial

As for counsels' purported failure to move to remove a juror whose husband had watched portions of the trial, this claim is without merit. When defense counsel became aware that a juror's husband had been in the courtroom, they immediately raised the matter with the Court and

requested that the juror and her husband be cautioned to refrain from discussing the case.
Tr. 427-29, 432.  In response to the Court's statement to the juror's husband, "your wife is there
[on the jury], you probably talk to her but you are not supposed to tell her anything," the husband
immediately responded, "I don't."  Tr. 433.  Thereafter, the juror's husband agreed to be in the
courtroom only when the jury was present and confirmed that he understood that he was not to
discuss the case with his wife during the trial.  Tr. 434-35.  Given the clear indication that the
juror's husband had not discussed the case with her and would not do so in the future, and given
that he agreed to be in the courtroom only when the jury was present, defense counsels' failure to
move to strike that juror could not be characterized as ineffective assistance.  Accordingly, this
claim is denied.

> e.  Failure to Adequately Investigate Case and Cross-Examine Witnesses

As for counsels' purported failure to adequately investigate the case and cross-examine
certain government witnesses, this claim is not supported by the record.  Mejia contends, *inter
alia*, that Macedonio and Unger "carried a caseload contrary to studies by the ABA for attorneys
to provide adequate assistance"; that counsel were "already burdened with an overwhelming
caseload"; and that with each "already assisting in more than 450 cases apiece, [they were]
plainly unable to devote the needed time to prepare interviews and test the governments [sic]
case."  Original Motion Mem. of Law at 9, 12.  Mejia further complains, more specifically, that
counsel were not adequately prepared to cross-examine government witnesses Michael Williams
("Williams") and Nassau County Ambulance Medical Technician Ernest Cook.  *See id.* at 13-14.

Contrary to Mejia's assertions, Macedonio states:

> Prior to and at the time of Mr. Mejia's trial, I was not

> carrying an overwhelming caseload. I was not, as Mr. Mejia
> apparently contends, carrying more than 450 cases. Similarly, Mr.
> Unger was not carrying an overwhelming caseload. Both Mr.
> Unger and I thoroughly prepared and vigorously presented Mr.
> Mejia's defense in a case in which the government was able to
> present overwhelming evidence . . . .

Macedonio Decl. ¶ 4.

A review of the pretrial and trial record supports Macedonio's contention that she and her co-counsel "thoroughly prepared and vigorously presented Mr. Mejia's defense." As for Williams' testimony, Williams had testified that, while cutting through a wooded area with friends on the night of September 13-14, 2003, he found Sanchez's lifeless body and called 911. As for Cook's testimony, Cook, the EMT who responded to the 911 call, testified that Sanchez was already dead when he arrived on the scene. The cross-examinations of both Williams and Cook clearly established that they had no idea who Sanchez was, who killed him, or why he was killed. Tr. 342-48, 360-62. As the government argues, it's hard to imagine what more any defense counsel could have done with such witnesses on cross-examination. The cross-examination of these witnesses, like the overall presentation of the defense case, was more than adequate. Accordingly, this claim is denied.

f. Failure to Object to Government's Proof

As for counsels' purported failure to argue at trial or on appeal that the government failed to prove that MS-13 had an effect on interstate commerce and that Mejia committed the murder in order to maintain or increase his position in MS-13, this claim is without merit. Mejia contends that "without Agent Alicea's hearsay testimony the government failed to prove that the murder was to protect the MS-13 gang or to further the defendant's position in the 'enterprise.'"

Amended Motion Mem. of Law at 8-9.  As the government argues, it was not required to prove

that Sanchez's murder was intended "to protect the MS-13 gang."  Section 1959 contains no such

element.  Nevertheless, the evidence clearly established that this was the case.  Indeed, in his

videotaped statement, Mejia stated that he killed Sanchez "because he was a snitch" and

"because he was probably going to keep doing the same thing -- ratting on probably, mostly,

everybody."  Similarly, the evidence clearly established the § 1959 motive element, as the

Second Circuit interprets that element.  *See*, *e.g.*, *United States v. Thai*, 29 F.3d 785, 817 (2d Cir.

1994) ("The motive requirement is thus satisfied if 'the jury could properly infer that the

defendant committed his violent crime because he knew it was expected of him by reason of his

membership in the enterprise or that he committed it in furtherance of that membership' "

(quoting *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992))); *see also United States*

*v. Desena*, 260 F.3d 150, 155 (2d Cir. 2001) (same).  In his videotaped statement, Mejia stated

that he killed Sanchez in order to earn his "quota" in the Hempstead MS-13 clique and added that

he was "a soldier," obligated to follow the orders of the senior MS-13 members who told him to

kill Sanchez.  This evidence, and corroborating testimony of other MS-13 members, clearly and

overwhelmingly established that Mejia murdered Sanchez in order to maintain or increase his

position in MS-13.  Counsels' failure to make a baseless argument does not constitute ineffective

assistance.

        Similarly, Mejia contends that counsel was ineffective by failing to argue at trial or on

appeal that the government "failed to show any effect on interstate commerce.  Without Agent

Alicea's testimony . . . the record is devoid of any effect on interstate commerce." Amended

Motion Mem. of Law at 8.  Given the evidence in this case, this claim is without merit.  As the

Second Circuit has explained, any conduct by the charged racketeering enterprise "having even a *de minimis* effect on interstate commerce suffices" to meet this requirement. *United States v. Mejia*, 545 F.3d 179, 203 (2d Cir. 2008) (citing *United States v. Davila*, 461 F.3d 298, 306 (2d Cir. 2006)). Moreover, the Second Circuit has made it clear that, in reviewing a sufficiency of the evidence claim, "we must make our determination concerning sufficiency taking into consideration even [] improperly admitted evidence." *Id.* (quoting *United States v. Cruz*, 363 F.3d 187, 197 (2d Cir. 2004)). Thus, even if Alicea's testimony (discussed below) was improperly admitted, it would still be considered in any sufficiency of the evidence review. Considering his testimony, the jury had more than ample evidence to find that MS-13 engages in or has an effect on interstate commerce. More importantly, even if Alicea's testimony were disregarded, there was abundant evidence relating to MS-13's effect on interstate commerce. For instance, in his videotaped statement, Mejia stated that MS-13 was "a Salvadorian, Central American gang" that was operating through various cliques in New York and that "[t]hey collect money to buy, buy stuff, like they collect money to buy guns, they collect money to buy cars or drugs." Similarly, Admettre testified that MS-13 cliques operated in New York, California, Texas, North Carolina, Virginia, and Florida, and that MS-13 treasury money was used "to bail people out [of jail], buy guns, buy bats, knives, bullets." Tr. 503. Admettre further testified that (1) prior to the Sanchez murder, MS-13 members from California had traveled to New York to attend meetings; (2) in the six-month period before the Sanchez murder, Admettre stole approximately 10 automobiles for MS-13 to use in drive-by shootings; (3) prior to the Sanchez murder, MS-13 on Long Island sold cocaine and marijuana in bars and local clubs in territory that the gang controlled; and (4) that MS-13 taxed drug dealers who wanted to sell narcotics in

territory the gang controlled. Reyes testified that he and other MS-13 members sold cocaine in bars and other locations controlled by MS-13, with a portion of the proceeds going into the clique's treasury, and that the treasury money was used "for weapons, guns, to bail people out [of jail], put money on whoever is locked up, put money in their commissary." Tr. 959. Zuniga testified that MS-13 is a street gang that was started in California and has cliques "all over the United States." Tr. 692. He further testified that the clique treasury was used "to buy either drugs sometimes, either pay money, guns," Tr. 694, and that MS-13 members would "buy drugs [including cocaine] through suppliers to sell them to benefit us," Tr. 696. Given the evidence, it was not ineffective assistance for Mejia's counsel to fail to argue at trial or on appeal that the government failed to present adequate evidence establishing that MS-13 had at least a *de minimis* effect on interstate commerce. Accordingly, this claim is denied.

g. Failure to Challenge to Alicea's Testimony

Mejia contends that Alicea's testimony violated, *inter alia*, his Sixth Amendment confrontation rights, as well as Federal Rules of Evidence ("FRE") 703, and that counsel rendered ineffective assistance in failing to challenge Alicea's testimony at trial or on appeal. The government argues that Alicea did not impermissibly rely on inadmissible hearsay in forming his opinions in violation of FRE 703, and that his testimony did not violate *Crawford*.

In support of this claim, Mejia relies mainly on two Second Circuit decisions which addressed Alicea's expert testimony relating to MS-13 in other trials of MS-13 members. *See United States v. Rubi-Gonzalez*, 311 Fed. Appx. 483, 2009 WL 464208 (2d Cir. 2009); *United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008). In both of those decisions, the Second Circuit held, *inter alia*, that admission of Alicea's testimony violated FRE 703 by transmitting hearsay

evidence directly to the jury, and that his testimony violated *Crawford v. Washington*, 541 U.S. 36 (2004), by communicating out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of expert opinion. *See Rubi-Gonzalez*, 311 Fed. Appx. at 487-88; *Mejia*, 545 F.3d at 197-99.

In *Mejia*, the court concluded that the admission of Alicea's testimony was harmless beyond a reasonable doubt regarding MS-13's enterprise status and MS-13's effect on interstate commerce, but it was not harmless regarding whether MS-13 engaged in acts and threats of murder. *Mejia*, 545 F.3d at 202. Regarding whether MS-13 engaged in acts and threats of murder, Alicea testified that MS-13 had committed between 18 and 23 murders on Long Island and that the purpose of MS-13 was to commit murders. *Id.* at 201. The court observed that

> Alicea was alone in testifying that MS-13 had actually committed eighteen to twenty-two or twenty-three murders in the preceding five years. Not considering Alicea's testimony, much of the remaining evidence consists of what is essentially "tough talk," and none of the remaining evidence shows that MS-13 had committed any murders. Even more so than the evidence of the drive-by shootings and the February 2003 incident, Alicea's testimony provided proof that this tough talk reflected the gang's actual practices rather than mere posturing. And while the Government did not spend a great deal of time in its closing argument emphasizing Alicea's testimony on that point, his testimony is virtually the first thing that the Government mentioned when directing the jury's attention to the proof that MS-13 engaged in acts and threats of murder.

*Id.* In concluding that Alicea's testimony in this respect was not harmless, the court reasoned:

> Apart from Alicea's testimony, the Government introduced only circumstantial evidence tending to prove that element; evidence that, though capable of supporting a jury's finding of guilt, does not compel such a determination. . . . Only in the rarest of cases will we find harmless the admission of the only direct evidence of murder, all other evidence of murderous conduct being partial and

> inexact. Where, as here, the Government must demonstrate acts and threats of murder, yet the Government introduces no admissible evidence of murder and only circumstantial evidence of threats, we cannot find the admission of direct evidence of multiple murders to have been harmless.

*Id.* at 202.

In *Rubi-Gonzalez*, the court concluded that the admission of Alicea's testimony was not harmless regarding both MS-13's effect on interstate commerce and whether MS-13 engaged in acts and threats of murder. *Rubi-Gonzalez*, 311 Fed. Appx. at 488. The court observed that, regarding acts and threats of murder, "Alicea's testimony with respect to this element was short, but definitive. He testified, simply, that MS-13 had committed multiple murders on Long Island and elsewhere." *Id.* In concluding that Alicea's testimony in this respect was not harmless, the court explained:

> The government elicited a lot of testimony from other witnesses as to MS-13's involvement in acts and threats of murder, but little of it was substantial, and almost all of it was "tough talk." For example, Sanchez testified that the best way to earn respect in MS-13 was to "tak[e] care of someone . . . kill[ ] somebody." Ortega said of a former MS-13 member who had dropped out of MS-13 to join the Latin Kings, "any time we see him we got to kill him." The MS-13 witnesses all agreed that if any MS-13 member cooperated with the police, they would receive the "death penalty."
>
> The closest the government came to tying MS-13 to a specific murder was an audio-recording between Rubi-Gonzalez and a confidential informant in which Rubi-Gonzalez discusses getting "authorization" to kill a rival gang member, a member of a gang called "MT." A Suffolk County Police Officer subsequently confirmed the murder of one "MT." However, on the audiotape, Rubi-Gonzalez explicitly denied responsibility for the actual murder. He told the confidential informant: "We . . . didn't do it. . . . . Other, other guys killed him. . . . I don't know who killed him."

> After carefully considering the evidence introduced at trial, we are not convinced that the introduction of Alicea's testimony as to acts and threats of murder was harmless beyond a reasonable doubt.

*Id.* at 488-89 (citations omitted).

Even assuming that certain of Alicea's testimony violated FRE 703 and *Crawford*, this Court concludes that counsel was not ineffective for failing to challenge the testimony at trial or on appeal because any such errors were harmless beyond a reasonable doubt and did not result in prejudice to Mejia. In determining whether the erroneous admission of Alicea's testimony was "harmless beyond a reasonable doubt," the Second Circuit instructs:

> Several factors are relevant when evaluating the error's likely impact: (1) the strength of the Government's case; (2) the degree to which the statement was material to a critical issue; (3) the extent to which the statement was cumulative; and (4) the degree to which the Government emphasized the inadmissible evidence in its presentation of its case. Though all of these factors are relevant, we have stated that the strength of the Government's case is "probably the single most critical factor."

*Mejia*, 545 F.3d at 199 (citation omitted).

Upon consideration, this Court concludes that the government's case was strong regarding the existence of MS-13, its effect on interstate commerce, and its involvement in acts and threats of murder, and that Alicea's testimony was cumulative of the other admissible evidence, particularly Mejia's own statements, the wake videotape, and testimony of the cooperating MS-13 members. There were significant differences in the scope of Alicea's testimony and the other evidence in Mejia's trial as compared to the other trials. For instance, none of the defendants in *Mejia* and *Rubi-Gonzalez* gave detailed, videotaped confessions in which they discussed the existence and nature of the charged racketeering enterprise, MS-13, as

did Mejia here. Mejia's own videotaped statement went a long way toward proving the existence

of MS-13; its effect on interstate commerce; and its involvement in the charged racketeering

activities. In his statement, Mejia admitted that he was "a soldier" in MS-13, which he described

as "a Salvadorian, Central American gang" with various "cliques" across Long Island. He stated

that the gang was involved in violent rivalries with other street gangs and that the members pool

their money "to buy guns, they collect money to buy cars or drugs." He explained that he

murdered Sanchez because Sanchez was "a snitch" who had provided the police with

information about a murder committed by another MS-13 member and that member was arrested

as a result. In his current motions, Mejia concedes the overwhelming nature of his confessions

when he says that "with the tape[d] confessions and the oral confessions, [Mejia's] chances of

winning were slim to none." Original Motion Mem. of Law at 10. Mejia's tattoos and the

"XVIII" shaved into his eyebrows at the time of his arrest also clearly demonstrated the existence

of, and his membership in, MS-13. In addition to his videotaped statement, the government

played the videotape of an MS-13 wake, which undeniably demonstrated the existence of the

MS-13 street gang. Moreover, the government offered the testimony of four MS-13 members:

Admettre, Reyes, Zuniga, and Ramos. As detailed above, these witnesses collectively presented

compelling evidence regarding MS-13 and its effect on interstate commerce, and more than mere

"tough talk" regarding MS-13's involvement in acts and threats of murder. In this respect, each

of the cooperating MS-13 members described their gang, including its structure, hierarchy, rules,

rituals, symbols, slang terminology, clique interaction, methods, and criminal activities. They

showed the jury their various MS-13 tattoos signifying membership and explained the meaning

of the tattoos. Admettre testified that he personally stole approximately 10 automobiles for the

MS-13 to use in drive-by shootings in the months prior to the Sanchez murder, and that MS-13 members from California had traveled to New York to participate in MS-13 meetings he attended prior to the Sanchez murder. Admettre, Reyes, and Zuniga each testified that MS-13 sold drugs, including cocaine, in specific bars on Long Island prior to the Sanchez murder. They further testified that MS-13 treasury money was used "to bail people out [of jail], buy guns, buy bats, knives, bullets," Tr. 503 (Admettre); "for weapons, guns, to bail people out [of jail], put money on whoever is locked up, put money in their commissary," Tr. 959 (Reyes); and "to buy either drugs sometimes, either pay money, guns," Tr. 694 (Zuniga). As noted above, Mejia stated in his videotaped statement that the firearm he used to kill Sanchez – a firearm manufactured outside New York State – was an MS-13 clique firearm. The cooperating defendants explained and described the violent rivalry between MS-13 and other street gangs. Admettre, Reyes, and Zuniga each testified that he had earned his "quota" through acts of violence directed against members of rival gangs. Zuniga admitted that, prior to the Sanchez murder, he attempted to murder a member of the Bloods. He also admitted attempting to stab a member of the Latin Kings. Admettre described how he had been involved in the shootings of four rival gang members in the months prior to the Sanchez murder. Reyes testified that, on behalf of MS-13, he engaged in a series of shootings, stabbings, beatings and other attacks against members of rival gangs for several years up until the time of his arrest. Admettre, Reyes, and Zuniga each testified that MS-13 members on Long Island had actually murdered members of rival gangs prior to the Sanchez homicide. They also testified, consistent with Mejia's videotaped statement, that the rules of the gang required that MS-13 members who cooperate with law enforcement authorities be murdered.

The testimony of the cooperating MS-13 members, particularly when considered with Mejia's own confessions and the wake videotape, overwhelmingly established the existence of the MS-13 and its effect on interstate commerce. Regarding whether MS-13 engaged in acts and threats of murder, in contrast to *Mejia*, Alicea's testimony was short and not specific about the number of murders, and the testimony of the cooperating MS-13 members was more than mere "tough talk." Alicea's testimony was similar to that in *Rubi-Gonzalez*, in that he testified only that people have been killed by MS-13 as a result of drive-by-shootings, providing no specifics or direct evidence as to numbers or circumstances. However, given the government's strong case against Mejia, and given the compelling evidence of MS-13's acts and threats of murder in this case, the Court concludes that Alicia's testimony regarding that element was harmless beyond a reasonable doubt.

The government further contends that defense counsels' decision not to move to exclude Alicea's testimony was a strategic decision, not an oversight, based upon the difficult tactical choices defense counsel had to make in a case in which the government possessed overwhelming evidence. In this respect, Macedonio states that after receiving the government's expert notification and reviewing all the evidence in the case, counsel "chose not to seek to exclude [Alicea's] testimony." Macedonio Decl. ¶ 7. The government argues that, given the evidence in this case, defense counsels' decision not to challenge Alicea's testimony was at least within "the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689. Although, ultimately, defense counsels' arguments were unsuccessful, the strategic decisions of defense counsel arguably were reasonable and designed to give Mejia the best chance of prevailing in a case in which the government possessed overwhelming evidence. As such, defense counsels'

decision not to move to exclude Alicea's testimony was not ineffective assistance. As defense

counsel must have understood from the pretrial disclosures, and as the Second Circuit has found,

Alicea was qualified to testify as an expert on MS-13. *Mejia*, 545 F.3d at 194. Furthermore, the

Second Circuit had repeatedly deemed "racketeering enterprises" to be a relevant subject area for

expert testimony, such that admission of testimony from an expert witness is proper as to the

nature, operation, symbols, jargon, practices, structure, rules, and methods of organized crime

and street gang enterprises. *See*, *e.g.*, *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994);

*United States v. Locascio*, 6 F.3d 924, 936-37 (2d Cir. 1993); *United States v. Daly*, 842 F.2d

1380, 1388 (2d Cir. 1988); *United States v. Levasseur*, 816 F.2d 37, 45 (2d Cir. 1987); *United

States v. Ardito*, 782 F.2d 358, 363 (2d Cir. 1986); *see also United States v. Mansoori*, 304 F.3d

635, 652-54 (7th Cir. 2002) (affirming use of expert gang specialist who testified to "the history,

leadership and operations of [street gang]" and gang's "involvement in narcotics activities").

Charged with murder under § 1959(a), Mejia faced mandatory life imprisonment upon

conviction. As noted, the government did not extend a plea offer prior to trial, leaving Mejia to

hope for an outright acquittal or, at least, a hung jury, despite overwhelming evidence against

him (including his detailed oral, written and videotaped statements, the testimony of several

eyewitness coconspirators, and proof that the murder weapon was found in his residence). As the

government argues, to obtain a hung jury or an acquittal, the defense counsel would have to

convince one or more jurors that either (a) Mejia's calm, detailed videotaped confession was

false, or (b) Mejia killed Sanchez under duress, and the fact that the murder weapon was found in

Mejia's residence did not necessarily indicate that he had committed the murder. Having

reviewed Alicea's 18 U.S.C. § 3500 materials, defense counsel reasonably could have concluded

that Alicea's testimony could help them make those arguments to the jury. On cross-examination, Alicea explained, *inter alia*, that young, Central American immigrants sometimes join MS-13 as a protective measure because they are threatened by members of rival gangs. He indicated that unstable family situations may also contribute to a young man's decision to join MS-13. These points helped lessen the impact of the undisputed evidence that Mejia was a member of MS-13. Similarly, Alicea testified (1) that members are required to follow the rules of the gang; (2) that those who failed to follow the rules could suffer violent consequences; (3) that Mejia "was never a shot-caller," Tr. 467, meaning that he never held a leadership position in the MS-13; (4) that MS-13 members do sometimes lie to protect other MS-13 members, even to the point of accepting responsibility for the criminal acts of other members, Tr. 451; and (5) that it was common within MS-13 to pass the clique firearms amongst members, Tr. 456-59. This testimony enabled a credible defense argument that (a) in his various confessions, Mejia falsely accepted responsibility for a murder actually committed by Zuniga, his fellow MS-13 member; (b) even if Mejia did actually shoot Sanchez, he was operating under duress because his failure to follow the orders of senior MS-13 members could have resulted in his own death; and (c) given the circulation of firearms, the fact that the murder weapon was found in Mejia's residence did not necessarily indicate that he committed the murder. Defense counsel reasonably could have determined that use of Alicea's testimony to establish a credible defense outweighed any harm regarding its impact on the jury's determination of the existence of MS-13, its effect on interstate commerce, and its involvement in the charged racketeering activities, given that the government had an abundance of evidence on those three elements from, *inter alia*, Mejia's videotaped statement, the wake videotape, and the direct and specific testimony of cooperating MS-13

members.

Nevertheless, even if Mejia's counsels' decision not to move to exclude Alicea's testimony was unreasonable, there is no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see, e.g.*, *Reiter*, 897 F.2d at 645 (affirming rejection of ineffective assistance of counsel claim even though defense counsel's failure to move to suppress evidence, poor cross-examination, and frequent lateness and absences fell below professionally reasonable standards, given overwhelming evidence of defendant's guilt). Absent the purported deficiencies in counsels' performance, there is no reasonable probability that the result of the proceeding would have been different, given the strength of the government's case and the cumulative nature of Alicea's testimony.

The government also argues that the jury's conviction on the murder conspiracy count makes it clear that the jurors found that MS-13 engaged in the racketeering activity of "acts and threats of murder" prior to the actual commission of the Sanchez murder. This Court agrees. As the government argues, the evidence overwhelmingly established, and the jury clearly found, that Mejia and his fellow MS-13 members conspired to murder Sanchez prior to Mejia's actual commission of the murder. Once the organization's members conspired to commit murder, the racketeering enterprise itself was engaged in acts and threats of murder, thereby satisfying that element of § 1959(a). Thus, at the time of the murder committed pursuant to that conspiracy, MS-13 itself was engaged in racketeering activity. Absent other evidence relating to MS-13's prior involvement in acts and threats of murder, the murder conviction itself would still stand.

Accordingly, this claim is denied.

The Court declines to issue a certificate of appealability because Mejia fails to make a

substantial showing of the denial of a constitutional right.  *See* 28 U.S.C. § 2253(c)(2).


III.  CONCLUSION

For the above reasons:  (1) the § 2255 motion is granted only to the extent that Count

Three should be dismissed (as the government concedes) and an Amended Judgment and

Commitment Order should be issued reflecting such dismissal, but is otherwise denied; and

(2) the Court declines to issue a certificate of appealability.  The Clerk of Court is directed to

close the file.

SO ORDERED.

_____/s/_____
LEONARD D. WEXLER
UNITED STATES DISTRICT JUDGE


Dated: Central Islip, New York
        May 24, 2012